**Yolanda Fuentes RIGGINS, Appellant,**

v.

**BOARD OF REGENTS OF the UNIVERSITY OF NEBRASKA, a Public Body Corporate; John Dzerk, in his official capacity, Appellees.**

No. 85–1943.

United States Court of Appeals, Eighth Circuit.

Submitted Feb. 3, 1986.

Decided May 12, 1986.

---

Thom K. Cope, Lincoln, Neb., for appellant.

John C. Witse, for appellees.

Before McMILLIAN, BOWMAN, and WOLLMAN, Circuit Judges.

BOWMAN, Circuit Judge.

Yolanda Riggins appeals the District Court's[1] judgment for the Board of Regents of the University of Nebraska in this 42 U.S.C. § 1983 suit. For reversal, she argues that the University violated her procedural due process rights by discharging her from its custodial staff without providing constitutionally adequate pretermination procedures.[2]

## I.

Riggins is a Hispanic woman who began working in the University of Nebraska custodial services division on April 4, 1977. From that time until the termination of her employment on February 15, 1983, she worked in four different buildings. She had problems getting along with several of her co-workers and with all three of her supervisors. At the time she was discharged her immediate supervisor was Bruce Kennedy. His supervisor was John Marker, an assistant manager of the custodial services division. Marker's supervisor was John Dzerk, the operations manager of the division.

On February 3, 1983, Riggins had some sort of problem with one of her co-workers. She filed a complaint and the police came to investigate, but no charges were filed. On February 4, she called in sick. On the same day, John Marker wrote her a letter informing her that she was being transfer-

---

1. The Honorable Warren K. Urbom, Chief Judge, United States District Court for the District of Nebraska.

2. Appellant's suit in the District Court asked for both damages and reinstatement. The District Court held that the Eleventh Amendment bars the claim for damages because the University of Nebraska is a state agency. On appeal, appellant asks only for injunctive relief (reinstatement until a proper hearing can be held) and thus has conceded the Eleventh Amendment issue.

red to a different shift in a different building. The letter stated that the move would satisfy her request for a change to the second shift, but that the primary reason was to minimize her relationships with other workers. Marker intended to give this letter to Riggins in person; he and Bruce Kennedy planned to talk to her about the reassignment.

Riggins never received the letter, however, because of what has been called the "walking away incident." Riggins called Marker on the evening of February 7 to ask whether she should report to her regular building, Ross McCollum Hall, for work that night. He told her to do so. He testified that he informed her that he and Kennedy were going to meet her there, and that she responded by saying she would not meet with both of them together. Marker and Kennedy went to find her at the beginning of her shift. Marker again told her that they wanted to talk to her about an employment matter. She said she would talk to them separately but not together. Marker then asked her if she was refusing to comply with his request; she answered "Whatever you want to call it," and according to his version she walked away down the hall. She claims that they walked away from her.

Marker then called Eli Cardona, the University's affirmative action officer, and asked him to come to Ross McCollum Hall. While Cardona was on his way over, Marker wrote his report of the incident. The two supervisors and Cardona met with Riggins, and Marker told her she was being suspended indefinitely for insubordination, pending a review of the situation and a final decision on her job status. He gave her his report to read, and she asked him to add that he had refused to talk to her without Kennedy. After he added this and his reason for doing so—his belief that the nature of what they had to tell her re-quired that her immediate supervisor be present—she signed the report.

The next day Marker prepared a proposed termination form recommending that Riggins be discharged for the insubor-dination incident of the previous night, especially in light of her work history and a prior counseling session about insubordination. He delivered this form to John Dzerk's office.

On February 9, John Dzerk met with Riggins for an hour and forty minutes. He read her Marker's report of the walking away incident. She told him her version of the incident and also gave him her reason for not wanting to meet with both of her supervisors at once: she said that they had shouted at her at a previous meeting. She was notified of the meeting with Dzerk ahead of time and certainly knew that it would be about the insubordination incident. Dzerk testified that he did spend five or ten minutes talking about her prior work history. At the end of the meeting, he said that he would confront Kennedy and Marker with her statements about what had really happened. He told her he would review her file and then decide on her employment status.

Two days later, Dzerk talked to Marker and Kennedy. He decided that Riggins was not telling the truth about the February incident or the earlier shouting incident. On February 15 he wrote her a letter stating that her employment was terminated because of her insubordination on February 7.

The University had a formal grievance procedure, which Riggins could have followed after her termination. This procedure is outlined in the University's Employee Handbook, and at trial Dr. Roy V. Loudon, Jr., a University personnel administrator, testified about the procedure in greater detail. There are three steps in the grievance procedure. In the final step, a grievance committee composed of members from the three major types of staff (academic, managerial/professional, and office/service) considers evidence from both sides. Grievants are allowed to have lawyers, to look at all material in their personnel files, and to present witnesses in their own behalf.

Riggins had used this procedure before, and she testified that she was aware of it

but chose not to use it to appeal her discharge. Instead, she filed a claim with the Nebraska Equal Opportunity Commission. She charged the University with national origin discrimination; the claim was settled for $4,000.00. Riggins signed a settlement release form, in which she gave up her rights to all other claims except the right to file a 42 U.S.C. § 1983 procedural due process claim. After the settlement, she filed this suit in district court.

Following a bench trial, the District Court concluded that the pretermination notice and hearing afforded to Riggins were not constitutionally inadequate. In reaching this conclusion, it relied in part upon the complete nature of the post-termination grievance process that was available to Riggins. The District Court also concluded that her claim regarding the constitutional inadequacy of the University's formal grievance procedure, if meant to be an independent procedural due process claim, was waived by her failure to file and prosecute a grievance. Judgment was entered for defendants, and Riggins filed her notice of appeal. Her basic contention is that the District Court erred in holding that she received adequate pretermination due process, and she argues that this is particularly true because there are, she asserts, inadequacies in the University's formal grievance procedure.

## II.

■ Public employees may have a property right in continued employment. *Cleveland Board of Education v. Loudermill*, —— U.S. ——, 105 S.Ct. 1487, 1491–92, 84 L.Ed.2d 494 (1985); *Board of Regents v. Roth*, 408 U.S. 564, 576–78, 92 S.Ct. 2701, 2708–10, 33 L.Ed.2d 548 (1972). When such property rights exist, they are created not by the Constitution, but by an independent source such as state law. *Loudermill*, 105 S.Ct. at 1491; *Roth*, 408 U.S. at 577, 92 S.Ct. at 2709. If an employee has a property right in continued employment, he may not be discharged from his job without due process. *Loudermill*, 105 S.Ct. at 1493. In this case, the University concedes that Riggins had a property interest in her job; therefore the only issue is whether she received the process that was due her in connection with her discharge. *Id.*

The Supreme Court recently has addressed the question of what pretermination process is due to a discharged public employee. In *Loudermill*, the Court held that when a public employee has a protected property interest in his employment, the Due Process clause requires that, prior to termination, the employee be given oral or written notice of the charges, an explanation of the employer's evidence, and an opportunity to respond. *Id.* at 1495. Although "some kind of a hearing" is necessary, *id.* at 1493 (citing *Roth*, 408 U.S. at 569–70, 92 S.Ct. at 2705), it need not be a formal one. "It should be an initial check against mistaken decisions—essentially, a determination of whether there are reasonable grounds to believe that the charges against the employee are true and support the proposed action." 105 S.Ct. at 1495. The Court pointed out that in only one case had it "required a full adversarial evidentiary hearing prior to adverse governmental action." *Id.* That case, *Goldberg v. Kelly*, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970), involved welfare benefits; if the wrong decision were made in such a case, the person who was erroneously deprived of benefits would lose his only means of subsistence while waiting for his post-termination hearing. In employment cases, where unemployment compensation or other benefits usually are available, the deprivation is not as severe, and the Court has not required as much pretermination process. *See Arnett v. Kennedy*, 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974).

In this case, the University accorded appellant the three elements of pretermination due process specifically named by the Supreme Court in *Loudermill*. Riggins had both notice and an explanation of the evidence against her; soon after the insubordination incident she was given Marker's detailed written report to read, and he added her comments to it before all the parties

present signed it. At that time she also had some opportunity to present her side of the story, and she had a better opportunity two days later in the long meeting with Dzerk. He read Marker's report to her again, and listened to her version of the incident. After the meeting was over, he went to the other participants to confront them with her claims. He ultimately decided that Riggins was not telling the truth, but the meeting with her had served the purpose of providing "an initial check against mistaken decisions," *Loudermill*, 105 S.Ct. at 1495, because she had been given an opportunity to tell her side of the story. In contrast, the Supreme Court found a violation of procedural due process in *Loudermill* because the plaintiffs had had no chance to rebut the charges against them before they were fired.

■ Riggins argues that she did not have proper notice because she did not know that her past work history would be discussed at the meeting with Dzerk. We disagree. This was only a minor part of the meeting, and the trial court found that she did have an opportunity during the meeting to defend herself on her work history. At trial she was unable to come up with any information she would have used in rebuttal had she had more notice. Furthermore, the ultimate reason for her discharge was her insubordination on February 7, as her letter of termination stated, and she had adequate notice and an opportunity to respond to the charges relating to that incident.

The pretermination process given Riggins, while it did not amount to a formal hearing, satisfies the due process requirements of *Loudermill*. In cases decided in the courts of appeal since *Loudermill*, similar informal meetings with supervisors have been found sufficient. *See Carter v. Western Reserve Psychiatric Habilitation Center*, 767 F.2d 270, 273 (6th Cir.1985); *Kelly v. Smith*, 764 F.2d 1412, 1414–15 (11th Cir.1985); *Brasslett v. Cota*, 761 F.2d 827, 836 (1st Cir.1985). *See also Navato v. Sletten*, 560 F.2d 340, 346 (8th Cir.1977) (failure to give employee notice of and op-

portunity to respond to several allegations before committee violated minimum due process rights).

The Supreme Court in *Loudermill* based its decision that the pretermination hearing need not be "elaborate" on the existence of more elaborate post-termination procedures. 105 S.Ct. at 1496. In Riggins's case, a more thorough process did exist, but she did not take advantage of it. In *Smith v. Sorensen*, 748 F.2d 427, 429 & 434–36 (8th Cir.1984), *cert. denied*, —— U.S. ——, 105 S.Ct. 2116, 85 L.Ed.2d 480 (1985), the discharged employees filed suit rather than following the post-termination procedures provided for by state law. This Court found no due process violation because the procedures that they could have used were constitutionally sufficient. In appellant's case, the University fulfilled the *Loudermill* requirement of a pretermination hearing that is an initial safeguard against wrong decisions. 105 S.Ct. at 1495. It would be unreasonable to require the employer to conduct a complete appeal or hearing process before discharging an employee merely because there is a chance the employee will choose not to use the available process after discharge. This effectively would intrude on the government's interest in removing an unsatisfactory employee without extensive delay. *See Loudermill*, 105 S.Ct. at 1495–96. This Court has said that: " '[A] state cannot be held to have violated due process requirements when it has made procedural protection available and the plaintiff has simply refused to avail himself of them [sic].' " *Bohn v. County of Dakota*, 772 F.2d 1433, 1441 (8th Cir.1985) (quoting *Dusanek v. Hannon*, 677 F.2d 538, 543 (7th Cir.), *cert. denied*, 459 U.S. 1017, 103 S.Ct. 379, 74 L.Ed.2d 512 (1982) ), *cert. denied*, —— U.S. ——, 106 S.Ct. 1192, 89 L.Ed.2d 307 (1986).

■ Appellant argues that the University of Nebraska's grievance procedure, which she could have used after her termination but did not, is constitutionally insufficient because it would not have provided her an opportunity to confront or cross-examine witnesses. "The fundamental re-

quirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Mathews v. Eldridge*, 424 U.S. 319, 333, 96 S.Ct. 893, 902, 47 L.Ed.2d 18 (1976) (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552, 85 S.Ct. 1187, 1191, 14 L.Ed.2d 62 (1965) ). Within this general framework different situations may require different specific procedures. *O'Neal v. City of Hot Springs National Park*, 756 F.2d 61, 63 (8th Cir.1985). In a recent case, this court listed four requirements of due process, not including the opportunity to cross-examine or confront witnesses, in the discharge of a tenured professor from a state university:

> 1) clear and actual notice of the reasons for termination in sufficient detail to enable him or her to present evidence relating to them;
>
> 2) notice of both the names of those who have made allegations against the teacher and the specific nature and factual basis for the charges;
>
> 3) a reasonable time and opportunity to present testimony in his or her own defense; and
>
> 4) a hearing before an impartial board or tribunal.

*King v. University of Minnesota*, 774 F.2d 224, 228 (8th Cir.1985) (quoting *Brouillette v. Board of Directors of Merged Area IX*, 519 F.2d 126, 128 (8th Cir.1975) ), *cert. denied*, —— U.S. ——, 106 S.Ct. 1491, 89 L.Ed.2d 893 (1986). *Accord Rosewitz v. Latting*, 689 F.2d 175, 177 (10th Cir.1982). *Cf. Nevels v. Hanlon*, 656 F.2d 372, 376 (8th Cir.1981) (plaintiff denied due process because not afforded opportunity to be confronted with adverse evidence and to cross-examine witnesses). If appellant had availed herself of the University's grievance procedure, she would have had all the protections listed in *King* and a fair opportunity to be heard. Due process in this context does not require more.

■ Moreover, as the District Court found, Riggins chose not to file a grievance. In so choosing, she waived any claim that the grievance procedure did not afford her the process she was due.

For the reasons set forth above, we affirm the judgment of the District Court.